George JACOBS, et al., Appellants,

v.

ROSEMOUNT DODGE–WINNEBAGO
SOUTH, Respondent,

Midas-International Corporation,
Respondent,

General Motors Corporation, Chevrolet
Motors Division, Defendant.

No. 51346.

Supreme Court of Minnesota.

Sept. 11, 1981.

Rehearing Denied Oct. 6, 1981.

Thiel, Sorenson, Thiel & Campbell and Russell A. Sorenson, Minneapolis, for appellants.

Cragg & Bailly, Gary J. Gordon and Christopher S. MacLennan, Minneapolis, for Rosemount Dodge-Winnebago South.

Stringer, Courtney & Rohleder and Owen L. Sorenson, St. Paul, for Midas Intern. Corp.

WAHL, Justice.

George and Laura Jacobs appeal from the judgment of the Dakota County District Court awarding them $3,309.77 in damages, instead of the $16,621 awarded by the jury, in an action for breach of warranty and fraudulent misrepresentation. The action arose because of defects in the Jacobs' new Midas motorhome and the failure of defendants Rosemount Dodge-Winnebago South (Rosemount Dodge) and Midas International Corporation (Midas) to repair those defects. We affirm in part, reverse in part, and reinstate the jury verdict.

In July 1977, the Jacobs saw a newspaper advertisement for a Midas motorhome on sale at Rosemount Dodge. They had a Diamond motorhome in which they took frequent weekend trips fishing, sightseeing, and visiting their children, as well as more infrequent cross-country trips. They were looking, however, for a newer, larger motorhome with more convenience features than the smaller one had because they were planning to winter in the South and to take a trip to the west coast before Laura Jacobs' eyesight failed completely. George Jacobs, 69 years old and semi-retired, needed an inner spring mattress for his back.

The Jacobs went to Rosemount Dodge on July 19, 1977, to see the motorhome which was advertised. Though some of the interior furnishings appeared to be damaged, the salesman assured them that the vehicle had never been in a trade show, a statement which later was ascertained to be false. The Jacobs agreed to purchase the Midas motorhome for $27,269, with $17,129 being allowed as the trade-in price on the Diamond motorhome the Jacobs already owned. The motorhome was delivered to the Jacobs' home on July 21, 1977. Mr. Jacobs signed the acceptance form and tendered a check for $10,000. Rosemount Dodge took possession of the Diamond motorhome. Mr. Jacobs asked the Rosemount Dodge salesman who delivered the new motorhome if it had been serviced. The salesman said no. He instructed the Jacobs to use the motorhome for the coming weekend, write down everything they found wrong with it, and return it with the list to Rosemount Dodge the following Monday so that the necessary repairs could be made.

From the initial trip, it was clear to the Jacobs that the motorhome was defective in a number of ways. In Mr. Jacobs' words, "We drove up to Brainerd and everything

was going wrong. My wife, instead of sitting up on the passenger seat where she was supposed to, she had to be in the back closing doors and keeping things from falling off, making notes of everything that had to be done."

The Jacobs returned the vehicle to Rosemount Dodge for repairs the Monday after their first weekend trip and on at least four subsequent occasions as further defects were discovered. Some of the defects were major operational problems; others were of a more cosmetic nature but prevented the vehicle from being fully useful as a motorhome. The defects alleged in plaintiffs' complaint were as follows:

(a) the frame was defective;

(b) the roof needed to be fixed because it leaked;

(c) insulation and ceiling panel above the driving compartment needed replacement (air rushed through driving compartment when vehicle was moving);

(d) the wires under the coach were shorting out;

(e) water pump wires were shorting out and breaking the circuit (water pump had to be wired to night light switch);

(f) the furnace and water heater did not function properly;

(g) stripes were coming off the wheel housings, and trim pulling apart on exterior of coach;

(h) drawers had a tendency to slide out when the vehicle was moving;

(i) windows throughout the vehicle were drafty;

(j) screws came out where cabinets were fastened to the roof;

(k) front overhead bunk rattled excessively;

(l) spark plug wires frequently came off plugs;

(m) the carburetor did not open fully (the linkage is defective);

(n) the steering wheel is too high and the gear shift lever is too close to the dash [to shift into some gears];

(o) the storage compartment door has no bracket to hold it open;

(p) the cruise control feature did not operate properly;

(q) water ran out of the air conditioner frequently;

(r) vacuum was not operable;

(s) the electrical outlets did not work;

(t) the ladder was defective;

(u) the rear springs and shock absorbers were defective.

Some of the defects were repaired by Rosemount Dodge, others were not, and still other items appeared to be in worse condition after being in the shop for repairs. Mr. Jacobs, a mechanic by trade, repaired some of the defects with the help of his son and had others repaired at his own expense. The nature of the problem with the motorhome design was such, however, that permanent repairs were not possible. As the trial court stated in its memorandum, from the statements of Midas' national service manager, "it could be unquestionably inferred that the motorhome as designed could not be repaired no matter how many times repairs were attempted on it * * * because the vehicle literally 'shook itself apart' on short trips."

The Jacobs considered the motorhome unsafe and virtually unusable. They did not winter in the South. They did not take the trip to the west coast, nor did they take their weekend trips to visit their children as frequently as before.

The motorhome was covered by two warranties: one from Midas, covering the body or coach, and one from General Motors Corporation-Chevrolet Motor Division (Chevrolet), covering the chassis. Plaintiffs knew of the two different warranties but believed all warranty work would be done by the dealer, Rosemount Dodge. Midas, the manufacturer of the motorhome body, requested that the vehicle be brought to the Midas factory in Elkhart, Indiana for repairs on March 6, 1978. An employee of Rosemount Dodge drove the motorhome to Elkhart and back, a trip accounting for approximately 1,000 miles of the odometer

reading. It was returned to the Jacobs on April 15, 1978, with many defects still uncorrected. In May 1978, the Jacobs returned the motorhome to Rosemount Dodge, where it remained for most of the summer of 1978. Mr. Jacobs sent a letter to Rosemount Dodge revoking his acceptance on July 12, 1978. The complaint in this suit was filed July 28, 1978. The motorhome was returned to the Jacobs in September 1978, and they had possession of it at the time of trial. At the request of Chevrolet, the motorhome was taken to Jay Kline Chevrolet in April of 1979, and inspection and repair of the chassis were made. The Jacobs considered the vehicle to be safer after this repair, since the steering and alignment problems seemed to be improved. They drove the motorhome about 900 miles after the letter of revocation. The odometer showed 5594.6 miles at the date of trial. Plaintiffs had paid all insurance and licensing fees plus the installment loan payments on the motorhome to the date of trial.

The jury made the following findings by special verdict: that the motorhome was defective in material and workmanship at the time of delivery to the Jacobs and that Rosemount Dodge and Midas failed to seasonably cure the defects; that the Jacobs gave timely notice to Rosemount Dodge of revocation of acceptance of the motorhome and did not by their subsequent conduct reaccept it; and that the Jacobs had sustained incidental and consequential damages in the amount of $16,621. The jury also found Chevrolet free from fault in that the chassis was not defective in any way at the time of delivery to Midas.

The trial court initially entered judgment for the Jacobs in the amount found by the jury. On post-trial motions by defendants, the court concluded it had erred in allowing argument of loss of use to the jury, amended the verdict, and reduced the damages to $3,309.77. In addition, the court denied the Jacobs' motion for attorneys' fees on the ground that such fees are not permitted as a separate item under the Uniform Commercial Code (U.C.C.) and are not included as part of incidental or consequential damages. The Jacobs appeal the reduction of damages and denial of attorneys' fees. Midas filed a notice of review with regard to the issues of revocation and indemnity.

■ 1. We consider first whether the Jacobs are limited to the remedies provided by the two warranties they received, one for the body and one for the chassis of the Midas motorhome. These warranties limit remedy to repairs necessary to cure defects and specifically deny recovery for consequential damages, such as loss of use of the vehicle, or other items not specified. Midas argues that the warranties provide adequate protection and are the Jacobs' exclusive remedy.

The exclusiveness of the warranty remedy is limited by Minn.Stat. § 336.2–719(2) (1980), which provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided by this chapter." In *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn.1977), we found that "[a]n exclusive remedy fails of its essential purpose if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain." 262 N.W.2d at 356. If the seller refuses to repair or replace within a reasonable time, the buyer is deprived of the exclusive remedy. Commendable efforts alone do not relieve a seller of his obligation to repair. *Id.*

In this case, the record clearly shows that the motorhome was returned to Rosemount Dodge several times to have the defects cured. The jury found as fact, in response to a special verdict interrogatory, that the motorhome was defective in materials and workmanship when it was delivered to the Jacobs and that both Rosemount Dodge and Midas failed to cure those defects when the motorhome was brought in for repairs. Looking at the facts in the light most favorable to the jury verdict, we hold that the trial court did not err in finding that the exclusive remedies of the warranty had failed in their essential purposes and that other U.C.C. remedies, such as damages and revocation, were available to the Jacobs.

Midas argues that, even if revocation were an available remedy, the revocation in this case was not timely, that the condition of the goods was changed, and, in any event, that the Jacobs reaccepted the vehicle by their actions after revocation. The jury found that the Jacobs had revoked their acceptance under Minn.Stat. § 336.2–608 (1980). In *Durfee*, we said:

> Section 336.2–608 prescribes the following requirements for an effective revocation of acceptance: (1) the goods must be nonconforming; (2) the noncomformity must substantially impair the value of the goods to the buyer; (3) the buyer must have accepted the goods on the reasonable assumption that the nonconformity would be cured; (4) the nonconformity must not have been seasonably cured; (5) the buyer must notify the seller of his revocation; (6) revocation must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects; and (7) the buyer must take reasonable care of the goods for which he has revoked acceptance.

262 N.W.2d at 353 (footnotes omitted).

■ In the case at hand, all parties admit that the vehicle was nonconforming. The question then becomes whether the defects substantially impaired the value of the goods to the buyer. The jury found in a special verdict interrogatory that the failure to seasonably cure the defects in the motorhome substantially impaired the value to the Jacobs. On review, an answer to a special verdict question will be set aside only if perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons. *Bergemann v. Mutual Service Insurance Co.*, 270 N.W.2d 107 (Minn.1978). The jury finding in this case is well supported by the evidence. The Jacobs testified that they had taken only a few short trips in the Midas motorhome, while they had traveled almost every weekend in the motorhome they had owned previously. They had taken long trips in their

previous motorhome but felt they could not do so safely in the Midas motorhome. The vehicle broke down on the road several times, and they had to be towed into a town for service or aided by one of their sons. They were without the use of the motorhome completely during the long stretches of time it was at Rosemount Dodge or Midas for repair. We see no reason to overturn the jury's finding of substantial impairment of the value to the buyers.

■ Midas does not deny, and the jury found, that the defects were not seasonably cured. The inquiry then proceeds to the timeliness of the revocation. Revocation must occur within a reasonable time after the buyer discovers the defect and before any substantial change in the condition of the goods occurs. Minn.Stat. § 336.2–608(2); *Durfee*, 262 N.W.2d at 353. The July 12, 1978 revocation letter was sent to Rosemount Dodge just short of 12 months after delivery of the motorhome. The Jacobs had accepted the vehicle on the reasonable assumption that any defects would be readily cured. Minn.Stat. § 336.2–608(1)(a). Under the circumstances of this case, we find that a year's time was not an unreasonably long time in which to attempt to make repairs. Defendants were on notice throughout that time that the Jacobs were dissatisfied and expected repair of the motorhome's defects. The motorhome was returned to defendants at least five times during that year for attempted repairs. To allow revocation in a case such as this is not unprecedented. *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 374 A.2d 144 (1976) (revocation 14 months after initial delivery where the dealer had attempted, unsuccessfully, to repair the major defects in the vehicle); *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 265 N.W.2d 513 (1978) (revocation of the acceptance of a defective motorhome 7 months after delivery); *Durfee*, 262 N.W.2d 349 (revocation of the acceptance of a defective car 9 months after delivery).

■ Midas argues that the number of miles driven in the motorhome rendered the

condition of the goods changed and indicated reacceptance by the Jacobs. The odometer registered 5594.6 miles at the date of trial, including the 1000 or so miles attributable to the repair trip to Elkhart. About 900 of those miles had been added after the revocation letter. We considered the 6300 miles driven in the defective car in *Durfee* troublesome but found, under the circumstances, that it did not constitute a substantial change in condition so as to preclude revocation of acceptance. 262 N.W.2d at 353 n. 4. *See also Hardimon v. Cullum & Maxey Camping Centers, Inc.,* 591 S.W.2d 771 (Tenn.App.1979) (7000 miles on defective motorhome); *Murray,* 83 Wis.2d at 428, 265 N.W.2d at 524 (3650 miles on defective motorhome). The 900 miles driven in the motorhome after revocation is not inconsistent with the necessity of checking the vehicle after repairs were made by Chevrolet. We have held that such use after revocation does not constitute reacceptance. *Johannsen v. Minnesota Valley Ford Tractor Co., Inc.,* 304 N.W.2d 654 (Minn.1981).

■ We do not find any actions of the Jacobs after the letter of revocation to constitute reacceptance. Rosemount Dodge brought the motorhome to the Jacobs in September 1978 because the new owners of the dealership did not want it on the lot. Unless the Jacobs had stored it and continued to make the loan payments on it, it would have been repossessed by the bank under the loan agreement. Such action would not be consistent with the buyer's duty to hold the goods with reasonable care at the seller's disposition, as required by Minn.Stat. § 336.2–602(2)(b). There is substantial evidence to support the jury's findings that the revocation was timely and that the Jacobs had not reaccepted the vehicle by their actions.

2. What measure of damages is appropriate in this case? The jury found damages in the amount of $16,621. The trial court, after post-trial motions, excluded consideration of evidence of loss of use and reduced the award to $3,309.77. The award as reduced included damages for finance charge interest, equity interest, insurance on the motorhome, and license fee. The Jacobs argue that the trial court erred in excluding consideration of loss-of-use evidence and that the jury verdict should be reinstated.

■ Incidental and consequential damages are recoverable following a seller's breach under Minn.Stat. §§ 336.2–714(3), 336.2–715 (1980). The trial court properly included items of incidental damages in the damages award. The Jacobs made loan payments, insured the vehicle, and licensed the vehicle in fulfillment of their duty under Minn.Stat. § 336.2–602(2)(b) (1980). The loan agreement required insurance and licensing. Expenses incurred for these items are appropriately awarded as incidental damages. Return on investment has been an appropriate form of damages since *Thoreson v. Minneapolis Harvester Works,* 29 Minn. 341, 13 N.W. 156 (1882). Defendants' arguments about the impropriety of any of the items of incidental damages fail.

■ The most difficult issue for our determination is whether consequential damages are appropriate in this case. The Jacobs argue that, because their exclusive remedy under the express warranties failed, they are entitled to all other U.C.C. remedies, including consequential damages for loss of use. The defendants argue that the Jacobs are not entitled to damages for loss of use of their recreational vehicle because of their continued use of the vehicle, their failure to seek or obtain needed repairs, and the fact that they established no date or time of revocation and submitted no evidence of purchase or rental of a substitute vehicle.

We have not decided cases on the question of allowing damages for the loss of use as a result of breach under the U.C.C. Courts which have faced this issue are divided on their resolution of it. We are persuaded by the reasoning of those courts which have held that an award based upon a bona fide effort to compensate for the consequences of the defects that established the breach of warranty is a remedy that the

U.C.C. seeks to provide.[1] *McGrady v. Chrysler Motors Corp.*, 46 Ill.App.3d 136, 4 Ill.Dec. 705, 360 N.E.2d 818 (1977); *Goddard v. General Motors Corp.*, 60 Ohio St.2d 41, 396 N.E.2d 761 (1979); *Mountaineer Contractors, Inc. v. Mountain State Mack, Inc.*, 268 S.E.2d 886 (W.Va.1980); *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 265 N.W.2d 513 (1978). Other courts have held that the failure of one exclusive remedy need not mandate the failure of other contractual provisions limiting recovery. *S. M. Wilson & Co. v. Smith International, Inc.*, 587 F.2d 1363 (9th Cir. 1978); *Williams v. Hyatt Chrysler-Plymouth, Inc.*, 48 N.C.App. 308, 269 S.E.2d 184 (1980); *Stutts v. Green Ford, Inc.*, 47 N.C.App. 503, 267 S.E.2d 919 (1980).

The U.C.C. does give parties substantial latitude to fashion their own remedies and alter or limit the damages which would otherwise be available upon a breach of contract, but the Code disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach. *Murray*, 83 Wis.2d at 418–20, 265 N.W.2d at 520, *Chemetron Corp. v. McLouth Steel Corp.*, 381 F.Supp. 245, 250 (D.Ill.1974), *aff'd*, 522 F.2d 469 (7th Cir. 1975). Subsection 2 of Minn.Stat. § 336.2–719 clearly provides that "where an apparently fair and reasonable clause because of the circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this article." 21A Minn.Stat.Ann. 753, U.C.C. Comment (West 1966). The limitations on remedies set out in the warranties in this case have operated to deprive George and Laura Jacobs of the substantial value of their bargain. We hold that other remedies of Chapter 336, including consequential damages, are available to them.

Consequential damages resulting from the seller's breach include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know * * *." Minn.Stat. § 336.2–715(2)(a). Loss-of-use damages have been allowed for defective private automobiles and motorhomes, including inoperable vehicles, but the burden is on the plaintiff to show what the losses are. Any award must be reasonable and not punitive. *See McGrady, Goddard, Murray.*

One commonly used measure of loss-of-use or lost-profit damages for a defective vehicle is reasonable rental value.[2] *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W.2d 655 (Minn.1978). Whatever the measure of damages, the buyer "must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages." *Murray*, 83 Wis.2d at 432, 265 N.W.2d at 526. It is not necessary, nor would it be possible for the buyer to minutely detail each element of damage. Such a burden would, as the *McGrady* court noted, dilute if not repeal the substantive remedy. 46 Ill.App.3d at 140, 4 Ill.Dec. at 709, 360 N.E.2d at 822. It is for the trier of fact, in this case the jury, to assess damages for loss of use so long as that assessment is reasonable and not punitive. *Id.* Where the measure of damages is not easily amenable to mathematical precision, the trier of fact must consider the general or particular needs of the buyer which the seller could have known at the time of contracting. *Murray*, 83 Wis.2d at 429–33, 265 N.W.2d at 525, 526; *McGrady*, 46 Ill.App.3d at 136, 4 Ill.Dec. at 705, 360 N.E.2d at 818. In considering the needs of the buyer, the specific buyer's needs and circumstances must be considered, not those of the average buyer.

1. Minn.Stat. § 336.1–106(1) (1980) provides that "the remedies of [Chapter 336] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."

2. Midas maintains that the Jacobs cannot recover, since they failed to "cover" their losses by renting another vehicle. The U.C.C. provides that a buyer may cover but, if he does not, such failure does not bar him from other remedies of the U.C.C. Minn.Stat. § 336.2–712(1), (3).

*McGilbray*, 221 Kan. 605, 561 P.2d 832. *See also Bergenstock v. Lemay's G.M.C., Inc.*, 118 R.I. 75, 372 A.2d 69 (1977).

The record in this case shows, and the jury considered, that the needs of these buyers were to travel and enjoy their retirement, to take scenic trips before Mrs. Jacobs' eyesight failed completely, to winter in a warmer climate, to visit their children, and to have confidence that their motorhome was safe and dependable for driving and comfortable and convenient to use as a home while traveling. The jury could have found, on the evidence before it, that none of these needs was met by the Midas motorhome. This is not a case where the recreational vehicle would have sat unused in the buyer's yard. The evidence is uncontroverted that the Jacobs used their previous motorhome as much as possible on weekends, including every weekend in the summer, and took a number of longer trips and that they expected to do the same with the Midas motorhome. Those expectations were postponed during the year in which repairs were attempted and were rightfully continued past the time of written revocation. The jury awarded damages in the amount of $16,621. The court allowed $3,309.77 of that amount to stand as incidental damages but as a matter of law struck the amount awarded by the jury as consequential damages. We hold that evidence and argument on consequential damages for loss of use was properly submitted to the jury. We will not interfere with the jury's award of damages unless our "failure to do so would be 'shocking' and result in a 'plain injustice'." *Dawydowycz v. Quady*, 300 Minn. 436, 220 N.W.2d 478 (1974). The record before us supports the jury award of consequential damages in what can only be described as an egregious case. We reverse and remand for reinstatement of the jury verdict.

3. The Jacobs moved, in the court below, for attorney's fees under the U.C.C. and under the Minnesota consumer protection act. The trial denied that motion on all grounds. We have long held that attorney's fees are not recoverable in litigation unless there is a specific contract permitting it or a statute authorizing such recovery. *Fownes v. Hubbard Broadcasting, Inc.*, 310 Minn. 540, 246 N.W.2d 700 (1976); *Midway National Bank v. Gustafson*, 282 Minn. 73, 165 N.W.2d 218 (1968). The parties agree that there is no contract covering attorney's fees.

Some courts have recently allowed attorney's fees as incidental expenses under U.C.C. § 2–715. *Cady v. Dick Loehr's, Inc.*, 100 Mich.App. 543, 299 N.W.2d 69 (1980); *Osburn v. Bendix Home Systems, Inc.*, 613 P.2d 445 (Okl.1980). We are not prepared to do so in light of our past decisions.

The consumer protection act in effect at the time of this transaction, Minn. Stat. c. 325 (1978), does authorize the recovery of attorney's fees as follows: "[A]ny person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fee * * *." Minn.Stat. § 325.907, subd. 3a (1978). The laws referred to in subdivision 1 of section 325.907 include the prevention of consumer fraud act, sections 325.78 to 325.80. Section 325.953, subd. 2, requires that the maker of an express warranty honor the terms of that express warranty. Failure to do so is a violation of section 325.79, Minn.Stat. 325.954 (1978), for which attorney's fees are recoverable. We have found, based on the jury's special verdict, that Midas violated the terms of the express warranty given to the Jacobs. As a matter of law, the breach of the express warranty so found constitutes a violation of the consumer protection act for which attorney's fees are recoverable. In this case, not only were the express warranties for repair and replacement violated, Midas was also in violation of the federal law requiring discovery, notification, and remedy of motor vehicle defects. 15 U.S.C. § 1391, *et seq.* (1978). The manufacturer is required to notify owners, purchasers, and dealers should it obtain knowledge of any motor vehicle or equipment defect when that defect relates to motor vehicle safety. 15

U.S.C. § 1411 (1978). Midas' national service manager testified that some 20 percent of the Midas motorhomes of the same model as the one purchased by the Jacobs had chassis problems due to the flexing of the motorhome body. The body, as designed, was too large for the chassis, resulting in the flexing, causing many of the problems experienced by the Jacobs. Though testimony indicated that the dealer, Rosemount Dodge, may have been told about this problem orally in an informal fashion, no written notification of the defect was received. The Jacobs received no notice of the defect at all. We view this failure to notify as fraudulent within the meaning of Minnesota's consumer protection act. The order of the trial court denying the motion for attorney's fees is reversed, and the matter is remanded to the district court for determination of reasonable attorney's fees and award thereof.

 4. Midas sought indemnity from Rosemount Dodge. The trial court denied its motion and instead awarded indemnity to Rosemount Dodge against Midas for any sums for which Rosemount Dodge had been held liable. Midas appeals that determination, arguing that Rosemount Dodge is required to indemnify Midas because it had breached its contractual obligations.

We said in *Durfee* that the buyer is entitled to look to the warrantor for relief when an express warranty is breached. 262 N.W.2d at 357. The defects in this case were attributable to the faulty design of the motorhome, for which Midas alone was responsible. The manufacturing defects caused the inability of Rosemount Dodge to make the repairs required by the warranty. Rosemount Dodge was, in effect, a mere conduit in the chain of distribution and should be allowed indemnification. *Accord, Massingale v. Northwest Cortez, Inc.*, 27 Wash.App. 749, 620 P.2d 1009, 1012 (1980).

Affirmed in part, reversed in part, and remanded for entry of judgment consistent with this opinion.