Donald E. HUGHES, et al.,
Respondents,

v.

SINCLAIR MARKETING, INC., f.k.a.
Pasco, Inc., Appellant,

Sinclair Oil Corporation, Defendant.

No. C7-84-2026.

Court of Appeals of Minnesota.

Oct. 29, 1985.

Review Granted Jan. 17, 1986.

William P. Luther, Minneapolis, for respondents.

Joe A. Walters, Robert A. Brunig, Minneapolis, Dan Bushnell, Merrill Nelson, Salt Lake City, Utah, for appellant.

Heard, considered and decided by POPOVICH, C.J., and WOZNIAK and HUSPENI, JJ.

## OPINION

WOZNIAK, Judge.

Sinclair Marketing, Inc. appeals from a judgment ordering it to pay damages to Donald Hughes and Clair Anderson for improper nonrenewal of a franchise under the Minnesota Franchise Act. Hughes and Anderson also appeal, urging that the two misrepresentation theories set aside by the trial court be reinstated as additional bases for the jury's award. Hughes and Anderson also request that the case be remanded to award attorney's fees for the appeal and to apply a multiplier to the fees award. We affirm the trial court's award of damages, and remand to the trial court to award attorney's fees for the appeal and to consider the appropriateness of a multiplier.

## FACTS

In April 1972, Hughes and Anderson signed a station lease and dealer agreement and became a Sinclair dealer known as Douglas Sinclair. In each of the years 1973, 1974, and 1976, Hughes and Anderson signed similar agreements. Hughes and Anderson trusted Sinclair and relied on Sinclair's assurance that, if they performed adequately, these form agreements would always be renewed. They closely followed Sinclair's program which was to sell a large volume of petroleum products, and overall the station was in the top 15 to 20% of Sinclair's stations.

Sometime after January 1973, Sinclair formulated a new policy of eliminating its independent dealers and operating its own stations with salaried managers. This

switch gave Sinclair more control over the stations and greater profits. While in 1972 Sinclair had 50 independent dealers in Minnesota, by 1976, there were only five independent dealers left.

In June 1976, Sinclair sent Hughes and Anderson a public offering along with another set of form agreements. The 1976 agreements were the first agreements which stated that Sinclair did not own the property on which the service station was located. The property was actually owned by Minnesota-Ohio Oil Company (M–O) and was leased to Sinclair; that lease was scheduled to expire in January 1977. While Hughes and Anderson were aware of the expiration of the M–O lease, they believed that they had no cause for concern. They understood that Sinclair could renew the lease or buy the property, and that Sinclair was negotiating the purchase with M–O. Everything they were told led them to believe that once Sinclair purchased the property, they would continue on as dealers.

In November 1976, Sinclair agreed to buy the property from M–O for $80,000. However, nothing was in writing because Sinclair thought it strategically better to have the lease terminate and get Hughes and Anderson to sign a release before the purchase took place. Relying on Sinclair's representations that it was still negotiating the purchase and believing that Sinclair was working to keep them on as independent dealers, Hughes and Anderson vacated the station at the end of December when the lease expired and signed a routine cancellation agreement. Sinclair drafted an additional release, which Sinclair described to Hughes and Anderson as only a necessary formality for the purchase from M–O, and this release was also signed. Through all of this, Sinclair never hinted that after the purchase it fully intended to run the business itself as a company-operated station.

Shortly thereafter, Sinclair signed the purchase agreement with M–O. When it finally became clear to Sinclair that Hughes and Anderson would not simply step aside and allow conversion to a company-operated station, Sinclair decided not to complete the purchase. In March 1977, Sinclair informed M–O that there were zoning problems and demanded the return of its earnest money, although Sinclair had never applied for a zoning permit for its improvement plan.

## ISSUES

1. Is the evidence sufficient to sustain the jury's award of $144,164 in damages?

2. Are Hughes and Anderson entitled to attorneys' fees and costs for this appeal, and did the trial court abuse its discretion in not awarding a multiplier for the attorneys' fees?

## ANALYSIS

### I.

Hughes and Anderson commenced this action against Sinclair alleging improper nonrenewal of a motor vehicle fuel franchise, misrepresentation under the Minnesota Franchise Act, and common law misrepresentation. Special interrogatories were submitted to the jury on each of the three theories, as well as a final question concerning total damages. The jury found as follows:

1. Improper nonrenewal—damages of $144,164;
2. Misrepresentation under the Act—damages of $144,164;
3. Common law misrepresentation—damages of $144,164;
4. Total damages suffered by plaintiffs —$144,164.

On appeal, Hughes and Anderson do not challenge the jury's total award of $144,-164.

A jury verdict will be overturned only if no reasonable mind could find as did the jury. *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984). In a multiple claim case, appellant must show that the damage award cannot be sustained under any of the plaintiff's theories in order to justify setting aside the jury's verdict.

*Hinkle v. Christensen*, 733 F.2d 74, 76 (8th Cir.1984); *LeSueur Creamery, Inc. v. Haskon, Inc.*, 660 F.2d 342, 347 n. 7 (8th Cir. 1981). Thus, we need only find that Hughes and Anderson are entitled to recover on the basis of one of their claims in order to sustain the verdict. While we have reservations as to whether the verdict can be sustained on the improper nonrenewal and common law misrepresentation claims,[1] it can be affirmed on the claim of misrepresentation under the Minnesota Franchise Act.

The jury found that Sinclair violated Minn.Stat. § 80C.13 and Minn.Regs. SDiv. 1718:

> No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Minn.Stat. § 80C.13, subd. 2 (1976).

> In connection with an offer, grant or sale of a franchise in this state, any person authorizing, aiding in, or causing such offer, grant or sale of franchises shall be deemed to be engaging in a "false, fraudulent or deceptive practice" * * * if such person:
>
> ⁙ * * * * *
>
> (4) Misrepresents:
>
> * * * * * *
>
> (cc) Any element of a franchise agreement or the business of the franchisor or any material disclosures required to be made in the public offering statement * * *.

Minn.Regs. SDiv. 1718(a)(4)(cc) (1982). The jury awarded $144,164 damages for misrepresentation under the Franchise Act.

 Sinclair challenges the jury's award on several grounds. First, it argues that there is insufficient evidence to support the jury's finding of misrepresentation. We do not agree. An appellate court cannot freely substitute its judgment for that of the jury. A jury's answer to a special verdict question:

> will be set aside only if perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons.

*Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981); *Bresson v. Stoskoph*, 370 N.W.2d 80, 82 (Minn.Ct.App.1985). The jury's decision was not manifestly incorrect in this case.

The 1976 public offering statement and accompanying forms for the *first time* suggested that Sinclair did not own the property on which the service station was located. The forms represented that Sinclair was not engaged in negotiations which might result in the disposition of the property, and yet Sinclair had drafted and signed a lease cancellation agreement for M–O's approval. When Sinclair finally informed Hughes that it was negotiating to purchase the property, Sinclair failed to state that it planned to convert the station to a company operation. From this evidence, the jury could have rationally concluded that Sinclair violated section 80C.13 and SDiv. 1718(a).

 Sinclair also asserts that the proper measure of damages for misrepresentation under the Franchise Act is out-of-pocket loss, and that the record does not support a finding of such damages. Minn.Stat.

---

1. Sinclair argues that only injunctive relief is available for improper nonrenewal of a fuel franchise under the Minnesota Franchise Act, and that the record does not support a finding of out-of-pocket damages under the common law misrepresentation claim. The trial court held that damages are recoverable for improper nonrenewal and that the record does not support a finding of out-of-pocket losses. Because we hold that the jury's award can be sustained on the theory of misrepresentation under the Franchise Act, we need not determine whether the trial court correctly decided these issues. However, we note that the trial court's decisions on these issues are not free from doubt.

§ 80C.17 governs civil liability under the Franchise Act:

> A person who violates any provision of sections 80C.01 to 80C.13 and 80C.15 to 80C.22 or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby * * *.
>
> \* \* \* \* \* \*
>
> Any suit authorized under this section may be brought to recover the actual damages sustained by the plaintiff together with costs and disbursements plus reasonable attorney's fees.

Minn.Stat. § 80C.17, subds. 1, 3. The two violations found by the jury, section 80C.13 and SDiv. 1718(a), are covered by these liability provisions. Thus, damages for misrepresentation under the Franchise Act are not limited to out-of-pocket losses, but rather include all actual damages caused by the violation of the Act. In this case, Hughes and Anderson suffered the loss of their service station business.

█ A proper measure of damages for misrepresentation under the Franchise Act where the fact of damage is the loss of a business is lost future profits. *See Hendrickson v. Grengs*, 237 Minn. 196, 54 N.W.2d 105 (1952); *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*, 734 F.2d 133, 148 (3rd Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 564–65, 83 L.Ed.2d 505 (1984). Thus, contrary to Sinclair's argument, the jury was not irrational in awarding the same amount of damages for misrepresentation under the Franchise Act as for improper nonrenewal (where the parties agreed that lost profits was the proper measure).

Sinclair asserts, however, that, because of numerous errors made in the calculation of lost profits, a new trial must be ordered. In analyzing this issue, our task is made difficult by Sinclair's failure to specifically state where the trial court erred. However, Sinclair made a much more critical error: it failed to object to the instructions which were given, request curative instructions, or raise these alleged errors in its post-trial motion. Because we do not consider issues raised for the first time on appeal, *Higgins v. Lufi*, 353 N.W.2d 150, 157 (Minn.Ct.App.1984), *pet for rev. denied* (Minn. Oct. 11, 1984), we need only determine whether the evidence is sufficient to sustain the jury's award of $144,164.

█ Damages for lost profits may be recovered so long as the damages are not speculative, remote, or conjectural. *Hornblower & Weeks-Hemphill Noyes v. Lazere*, 301 Minn. 462, 467, 222 N.W.2d 799, 803 (1974). Once the fact of loss is established:

> the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount.

*Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824, 826 (Minn.1977); *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 775 (Minn.Ct. App.1985). Plaintiff's expert testified regarding the lost profits suffered by Hughes and Anderson. He averaged the profits of the service station for three years, projected this average over the work life expectancy of Hughes and Anderson with an inflation factor, applied a 10% interest rate to the average yearly balance, and then brought the total back to a present value. The expert testified that the total lost profits were $406,518. The jury's award of $144,164 cannot be said to be manifestly incorrect.

## II.

█ Hughes and Anderson request attorneys' fees and costs for this appeal, and request that a multiplier be applied to the fees.

Minn.Stat. § 80C.17 provides for the award of attorneys' fees and costs. It would be inconsistent with the intent of the legislature, in providing for attorneys' fees, to dilute a fee award by refusing to compensate an attorney for the time reasonably spent on appellate work defending a judgment. *See Perkins v. Standard Oil*

*Co.,* 399 U.S. 222, 223, 90 S.Ct. 1989, 1990, 26 L.Ed.2d 534 (1970); *Fleet Investment Co., Inc. v. Rogers,* 505 F.Supp. 522, 524 (W.D.Okla.1980).

The trial court did not respond to plaintiffs' request for a multiplier for the attorneys' fees, and thus we must remand for a decision on this issue. The trial court should bear in mind the complexity of the litigation, the fact that the liability of defendant was never definite, the time commitment involved, the delay in recovery, and the public policy embodied in the Franchise Act.

### DECISION

We affirm the trial court's decision, but remand to the trial court to determine the attorneys' fees and costs on appeal and whether a multiplier should be applied.

Affirmed in part and remanded in part.