Donald E. HUGHES, et al.,
Respondents,

v.

SINCLAIR MARKETING, INC., f.k.a.
Pasco, Inc., Petitioner, Appellant,

Sinclair Oil Corporation, Defendant.

No. C7–84–2062.

Supreme Court of Minnesota.

June 13, 1986.

Joe A. Walters, Douglas M. Carnival, Robert A. Brunig, Minneapolis, Dan S. Bushnell, Merrill F. Nelson, Salt Lake City, Utah, for appellant.

William P. Luther, Alan L. Dworsky, Minneapolis, for respondents.

YETKA, Justice.

On May 10, 1978, respondents Donald Hughes and Clair Anderson brought suit in Hennepin County District Court against appellant Sinclair Marketing. The district court, pursuant to a jury verdict, rendered judgment for the plaintiffs on July 3, 1984, and denied the appellant's post-trial motions on July 30, 1984. Sinclair appealed to the court of appeals, which affirmed the district court, 375 N.W.2d 875. Appellant then petitioned this court for further review, and the court granted the petition on January 17, 1986. We affirm the court of appeals in part and reverse in part.

In early 1972, respondents Donald Hughes and Clair Anderson decided to become business partners and began investigating their opportunities. Answering an advertisement, they contacted the appellant concerning a Sinclair service station franchise at 36th Street and Douglas Drive North in Crystal, Minnesota.[1] Sinclair's representative told respondents that the company wanted a dealer on a long-term basis. He did not, at that time, inform them that Sinclair leased the station property from the Minnesota-Ohio Oil Company or that the lease terminated in December 1976.[2] Hughes and Anderson signed a dealer agreement and station lease in April 1972, which were regularly renewed until 1976. Under the respondents' operation, the Sinclair station posted losses in 1972 and 1976, but was profitable during 1973–75 and sold in excess of $2.2 million in gasoline. During this period, however, Sinclair began to convert its franchises into company-owned stations with salaried managers.

Since the Sinclair/Minnesota-Ohio lease was scheduled to run out in December 1976, the parties entered negotiations that fall. Sinclair intended to purchase the property and reached a preliminary price of $80,000 in October 1976. The parties did

---

1. In December 1972, Pasco, Inc., and Pasco Marketing, Inc., assumed the obligations of the Atlantic Richfield Company which, in 1972, owned the Sinclair trade name. Pasco Marketing was sold to appellant Sinclair Oil Corp. on July 1, 1976, and became Sinclair's wholly owned subsidiary, Sinclair Marketing, Inc. (hereinafter referred to as "Sinclair"). The district court determined that the subsidiary was solely liable for any damages in the present case. The issue has not been appealed.

2. While the first official notification of the Sinclair/Minnesota-Ohio lease was apparently a 1976 public offering statement, Hughes and Anderson testified that they were aware of the arrangement as early as 1973–74.

not, at that point, sign a purchase agreement.[3]

Respondents maintain that Sinclair represented it was negotiating to purchase the property in order to renew their franchise and that it would be necessary for them to vacate before the sale could be completed. They received documents from Sinclair in June and December of 1976 reminding them of the Sinclair/Minnesota-Ohio lease and requiring them to vacate. They signed a cancellation agreement in December 1976 and vacated at the end of the month. In January 1977, Sinclair presented, and respondents signed, a release of respondents' contractual and franchise rights in consideration for $2,000 and Sinclair's good faith effort to purchase the station for $70,000 or less. They were not aware that the preliminary purchase price Sinclair and Minnesota-Ohio had reached in October 1976 was $80,000. The release also contained an ambiguous clause reciting that Sinclair, upon purchase, would run the station as a "company Sinclair service station." Furthermore, Sinclair had retained a right of first refusal on any purchase of the station. Over the next several months, it became clear to Hughes and Anderson that Sinclair was neither going to purchase the Douglas Sinclair station nor offer them an alternative franchise.

Respondents brought suit against Sinclair on May 10, 1978. The complaint and amended complaints alleged, inter alia, that Sinclair violated the Minnesota franchise act by improper non-renewal and misrepresentation and committed common law misrepresentation. Sinclair denied the allegations, maintaining that the cancellation and release document signed by Hughes and Anderson estopped them from asserting their claims and that the franchise act does not allow damages for improper non-renewal.

The matter was tried to a jury, which found Sinclair liable as follows:

1. Improper non-renewal—damages of $144,164;

2. Misrepresentation under the act—damages of $144,164;

3. Common law misrepresentation—damages of $144,164;

4. Total damages suffered by plaintiffs—$144,164.

Pursuant to the jury's answer, the court entered its findings of fact, conclusions of law and order for judgment on July 3, 1984. The court awarded Hughes $69,440 in damages and Anderson $74,724 (totaling $144,164). Attorney fees and costs were entered in the amount of $52,662.45 plus interest. In the court's conclusions of law and order for judgment, however, it based liability solely on improper termination of a franchise under the act. The district court found no evidence in the record of any out-of-pocket losses to support an award of actual damages for either common law misrepresentation or misrepresentation under the franchise act.

Sinclair made post-trial motions for judgment NOV, remittitur, and a new trial, which the court denied on July 30, 1984. In its memorandum, the court held that injunctive relief was not the plaintiffs' exclusive remedy under the franchise act, especially since such relief was not available to the plaintiffs due to Sinclair's misrepresentations.

Sinclair appealed to the Minnesota Court of Appeals, which affirmed in part and remanded in part. *Hughes v. Sinclair*, 375 N.W.2d 875 (Minn.App.1985). The court ruled that, while it had reservations about the district court's findings concerning the improper non-renewal and common law misrepresentation claims, it would sustain the jury's award of damages based on misrepresentation under the franchise act. Such damages are not, the court held, limited to out-of-pocket losses, but include lost

---

**3.** In January 1977, Sinclair and Minnesota-Ohio signed a purchase agreement contingent on Sinclair's running the station in the "customary manner." Sinclair later maintained that zoning complications prohibited it from making necessary improvements in the station and, therefore, it did not complete the purchase. Litigation ensued between Sinclair and Minnesota which was later settled.

future profits. The court further held that appellant's objections to the evidence used in calculating damages was not properly preserved for appeal and that the amount awarded was not manifestly incorrect. Finally, the court remanded to determine attorney fees for the appeal and whether a multiplier should be applied to the fees awarded.

Sinclair petitioned this court for further review, which was granted on January 17, 1986.

The issues raised on appeal are:

I. Whether there is evidence sufficient to support liability on the basis of misrepresentation or improper non-renewal under the Minnesota franchise act or common law misrepresentation;

II. Whether the damages awarded are allowed under the act;

III. Whether the evidence presented was sufficient to support the amount awarded; and

IV. Whether the respondents are entitled to a remand to determine attorney fees on appeal and application of a fee multiplier.

The issues in this case narrowed considerably after oral argument because, at that time, appellant's attorney all but conceded that if there is evidence to support the jury's findings of fact, he is bound by those findings. The appeal, therefore, is not complicated by the fact that the lower courts apparently based liability on different jury findings.

I. Appellant Sinclair argues that the misrepresentation claims were not supported by the evidence and were improperly based on a mere statement of future intent. Furthermore, it asserts that there was no actual reliance on Sinclair's statements since the franchise would have inevitably ended with the expiration of the underlying Sinclair/Minnesota-Ohio lease. Sinclair also contends that the verdict cannot be sustained on grounds of improper non-renewal since there was a mutual agreement and a good faith voluntary decision not to renew based on the expiration of the Minnesota-Ohio lease.

Respondents Hughes and Anderson maintain that Sinclair misled them concerning its present intent to operate the station itself and not to renew their franchise and, due to these misrepresentations, they signed the release and vacated. They argue that Sinclair had the obligation either to renew the franchise automatically or offer a new franchise, neither of which it did. Liability based on improper non-renewal should be upheld, according to respondents, since the mutual agreement was fraudulently induced and the decision to end the franchise was not done in good faith, but in order to convert the station illegally to a company-owned facility.

The present case is governed by the Minnesota franchise act. Minn. Stat. § 80C.01–.22 (1984). Under section 80C.13, subdivision 2, misrepresentation in connection with the offer or sale of a franchise is prohibited:

No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

The terms "offer" or "sell" include the "renewal or extension of an existing franchise for value." Minn.Rules 2860.0100, subp. 9 (1985). Unfair practices in the terms or conditions of a franchise are prohibited under section 80C.14, subdivision 1, and the commissioner of commerce has the authority under sections 80C.14 and 80C.18 to promulgate specific definitions of unfair and fraudulent practices for motor vehicle fuel franchises. The commissioner has deemed it a fraudulent practice for a person to "misrepresent * * * any element of a franchise agreement or the business of a franchiser or any material disclosure required to be made in a public offering statement." Minn.Rules § 2860.4500, subp. D(3) (1985). Under Rule 2860.5200,

subpart E, a public offering statement shall contain: "a statement disclosing the interest, and the nature thereof, enjoyed by the supplier in the location and, further, a disclosure of any other interest, and the nature thereof, enjoyed by any other person in said location." In addition, a suit for common law fraud is not pre-empted by the franchise act. Minn.Stat. § 801C.17, subd. 4.

The act also provides a cause of action for improper non-renewal of a franchise. Where the supplier and the dealer have been parties to one or more franchise agreements extending for 3 consecutive years, the supplier shall automatically renew the existing franchise agreement or, in good faith, offer another franchise. Minn. Rules 2860.5600, subp. B (promulgated pursuant to Minn.Stat. § 80C.14, subd. 2). The supplier may, however, cancel its relationship by mutual agreement or good faith voluntary or involuntary decision by the franchisor to discontinue doing business at the site. Minn.Rules 2860.5500, subp. A(1), (4).

■■■ This court will sustain a jury verdict if it is possible to do so on any reasonable theory of the evidence. *Bergemann v. Mutual Service Insurance Co.*, 270 N.W.2d 107, 109 (Minn.1978). It will set aside a jury verdict only if manifestly contrary to the evidence when viewed in the light most favorable to the verdict. *Lesmeister v. Dilly*, 330 N.W.2d 95, 100 (Minn. 1983); *Lamke v. Louden*, 269 N.W.2d 53, 56 (Minn.1978). Under the applicable standard of review, it appears that the verdict could be sustained on all three bases of liability: misrepresentation under the act, common law fraud, and improper non-renewal of a franchise. The court correctly instructed the jury on the elements of each cause of action, including statements of present intent and good faith termination.

II. Appellant further argues that the court of appeals erred by allowing lost future profits as actual damages for misrepresentation under the franchise act and that the district court was limited to injunctive relief for improper non-renewal. If the court allows lost future profits on either basis, appellant also disputes the amount awarded.

Respondents maintain that "actual damages" awarded for misrepresentation under the act include lost future profits. They also claim that the actual damages provision applies to improper non-renewal. Finally, they argue that any objection appellant has to the amount awarded is not properly preserved for appeal and that there is, nonetheless, a clear, reasonable basis established by the evidence for the jury's award.

The traditional recovery for common law misrepresentation in Minnesota is limited to out-of-pocket loss. *Strouth v. Wilkison*, 302 Minn. 297, 300, 224 N.W.2d 511, 514 (1974). The district court instructed the jury that, on either theory of misrepresentation, damages would not include benefit of the bargain. The court of appeals, however, found that the language of the franchise act indicates that damages for misrepresentation under the act are not to be limited to out-of-pocket losses. Minn.Stat. § 80C.17, subds. 1, 3 provide:

> Subdivision 1. A person who violates any provision of sections 80C.01 to 80C.13 and 80C.15 to 80C.22 or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate.

> \*　　\*　　\*　　\*　　\*　　\*

> Subd. 3. Any suit authorized under this section may be brought to recover the actual damages sustained by the plaintiff together with costs and disbursements plus reasonable attorney's fees.

The court of appeals reasoned that the term "actual damages" expanded the available remedies beyond out-of-pocket losses to include any damages caused by the violation. Since the damages included the loss of a business, the court found that future profits were properly awarded.

■ The meaning of the term "actual damages" as used in section 80C.17, subdivision 3 has not been resolved by this court. The purpose behind limiting damages for common law misrepresentation to out-of-pocket loss is to avoid speculative damages and assure that the award is measured by the natural and proximate loss sustained by the defrauded party. *See Hollerman v. F.H. Peavey & Co.*, 269 Minn. 221, 130 N.W.2d 534 (1964). The court has recognized an exception to the general rule when out-of-pocket damages fail to return a party to the status quo. *See Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 235 N.W.2d 831 (1975) (return of premiums paid inadequately compensated an insured whose policy has been wrongfully terminated). This court has also ruled that the proper measure of damages for interruption of an established business includes lost future profits. *See Hendrickson v. Grengs*, 237 Minn. 196, 54 N.W.2d 105 (1952). In the present case, Sinclair's misrepresentations induced the respondents to forego their renewal rights under the franchise act and thereby lose their business. Since the district court found that the record did not sustain a finding of out-of-pocket loss, application of the common law rule would fail to return Hughes and Anderson to their condition before Sinclair's misrepresentations. We hold that, under the circumstances of this case, lost future profits may be recovered by the respondents as "actual damages" for misrepresentation under the act.

■ The district court based its judgment on improper non-renewal. Finding that improper non-renewal of a motor vehicle service station franchise is governed by Minn.Rules 2860.5500, promulgated under the statutory authority of Minn.Stat. § 80C.18, the court held that section 80C.17, allowing suit for actual damages, governed the remedies available.[4] Sinclair, however, maintains that improper non-renewal is actually governed by section 80C.14 and, therefore, the civil liability provisions of section 80C.17 are not available and only injunctive relief under section 80C.14, subdivision 1 would apply.[5]

Since Minn.Rule 2860.5500 was explicitly promulgated under section 80C.18, the actual damages provision of section 80C.17, subdivision 3 applies and the respondents were not limited to injunctive relief in their suit for improper non-renewal.

■ III. Sinclair argues that errors were made in the calculation of lost future profits.[6] The alleged errors, however, go to the weight of the evidence and not its admissibility. Sinclair was able to conduct a full cross-examination of the respondents' expert and introduced its own expert testimony. This court will not interfere with the jury's award of damages unless its failure to do so would be shocking or would result in plain injustice. *Schoenecke v. Ronningen*, 315 N.W.2d 612 (Minn.1982); *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 79 (Minn.1981). In upholding awards for loss of profits, we have not required absolute certainty in the

4. Section 80C.18, subdivision 1 provides:
   The commissioner may promulgate rules and regulations to carry out the provisions of sections 80C.01 to 80C.22 * * *. The commissioner may also define by rule false, fraudulent or deceptive practices in the offer and sale of franchises. For the purposes of rules and forms the commissioner may classify franchises, persons and matters within his jurisdiction, and prescribe different requirements for different classes.
5. The civil liability section governs a person who "violates any provision of sections 80C.01 to 80C.13 and 80C.15 to 80C.22 or any rule or order thereunder * * *." Minn.Stat. § 80C.17, subd. 1.

6. Respondents' expert witness determined damages by averaging the plaintiffs' earnings for 1973–75, disregarding 1972 and 1976 as "start-up" and "wind-down" years, calculating in interest and inflation of 5% for the balance of the plaintiffs' work-life expectancies, and reducing the totals to their present values. On cross-examination, he admitted he did not use weighted averages, calculate in the 2 years Douglas Sinclair posted losses, discount future earnings or take into account the temporary inflation of gasoline prices due to the then current Arab oil embargo.

damage calculations, but reasonable certainty. *Duchene v. Wolstan*, 258 N.W.2d 601 (Minn.1977); *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 125, 211 N.W.2d 159, 166 (1973). The damages awarded by the jury were modest by any rule and were far less than the figure offered by respondents' expert. The amount of damages indicates that the jury offset its award by future wages and dispensed with the claim of future speculative profits. Given the applicable standard of review, the verdict will not be overturned.

IV. Hughes and Anderson petitioned the district court for $47,495.25 in attorney fees and the application of a multiplier of 1.5. The trial court awarded $50,-395.25 in attorney fees, finding this "reasonable within the meaning of Minn.Stat. § 80C.17, subd. 3." The court of appeals found that the trial court failed to rule on the issue of the multiplier. Furthermore, it held that attorney fees could be awarded for the appeal under section 80C.17, subdivision 3 and, therefore, remanded the case on the attorney fees issues. From the wording of the respondents' petition and the district court's order, we conclude that the court did consider a multiplier in its determination of reasonable attorney fees. We find that the trial court did not commit an abuse of discretion in denying the request for a multiplier. Accordingly, we reverse the court of appeals on the issue of remanding to the trial court for determination of a multiplier and reinstate the trial court's award of attorney fees of $50,-395.25 plus interest.

Concerning attorney fees for services rendered before the court of appeals and this court, we believe it the better practice in franchise act suits for the appellate courts themselves to determine appropriate attorney fees for the appeals portion of the lawsuit rather than to remand to the trial court. Since the court of appeals has not ruled on attorney fees, we will deal with the issue of what attorney fees are allowable before both courts. Respondents' attorney is authorized to file a petition along with his taxation of costs and disbursements requesting additional attorney fees along with such other documentation as will enable this court to make a decision on attorney fees to be allowed before both the court of appeals and this court. Appellant may file a written objection to respondents' petition should it feel necessary to do so.

The court of appeals is affirmed in all respects with the exception of the remand for attorney fees and application of a multiplier. As to attorney fees, the determination of the trial court is affirmed, and the determination of attorney fees allowable on appeal is left to the further order of this court.